Russell v. Electric Garage Co.

DAVID A. RUSSELL, APPELLEE, V. ELECTRIC GARAGE COM-
PANY, APPELLANT.

FILED JANUARY 24, 1912.  No. 17,094.

1. Appeal: HARMLESS ERRORS. Record examined, and *held* to show no
   reversible errors of law.
2. Negligence: SUFFICIENCY OF EVIDENCE. The evidence examined and
   set out in the opinion, *held* sufficient to sustain the verdict of
   the jury and the judgment of the trial court.

APPEAL from the district court for Douglas county:
WILLIS G. SEARS, JUDGE. *Affirmed on condition.*

*Francis A. Brogan* and *O. C. Redick,* for appellant.

*Smyth, Smith & Schall,* contra.

FAWCETT, J.

Action for personal injuries alleged to have been re-
ceived through the negligence of defendant in causing a
collision of defendant's electric automobile with a hack
driven by plaintiff. Verdict and judgment for plaintiff.
Defendant appeals. We do not find any reversible errors
of law in the record. The only debatable question is one
of fact—the sufficiency of the evidence of negligence on
the part of defendant.

At the close of plaintiff's case, defendant moved for a
directed verdict, which motion was overruled. It is un-
necessary to pass upon this ruling of the trial court, for
the reason that defendant waived the error, if any, in such
ruling by proceeding with the trial and introducing evi-
dence upon the issues joined by the pleadings. At the
close of all of the evidence, defendant again requested the
trial court to direct the jury to return a verdict in its
favor, for the reason that plaintiff had failed to show any
negligence on its part which caused the accident and the
resulting injuries to the plaintiff. The motion was, in our
judgment, properly overruled. As the case then stood, it
was clearly one for a jury.

The evidence is quite voluminous. So much so that it would unwarrantably extend this opinion to attempt to set it out at length. Summed up, it shows that plaintiff was driving along an important public street in the city of Omaha at about the hour of midnight. It was raining and the street somewhat slippery. The vehicles were traveling in the same direction, east, and at substantially the same rate of speed. At the point where they were traveling there was a slight down-grade, but there is no evidence to show that the street was not perfectly level north and south between the curbs. The driver of the electric car was entirely shut in, his only means of keeping an outlook ahead being through a glass window badly blurred by the falling rain. This window could have been opened so as to have afforded him an unobstructed view ahead. When he finally saw the hack about 25 feet ahead of him, the only effort he made to avoid a collision was by applying the brakes. When he applied them the car began to "skid." Observing then that his brakes were not having the desired effect, we think it was plainly his duty to have used his steering lever and turned out so as to avoid the collision. That the mechanism of his car was all in working order, and that there was ample room to have passed the hack on either side, is admitted. The driver says he was helpless. That, under the evidence, is an unwarranted conclusion. If he had testified that, when he found his brakes were not going to prevent a collision, he tried to turn out, but was unable to do so, that claim might have been made with some show of reason. We do not think it is a sufficient exercise of diligence by the driver of an automobile, when he sees he is about to collide with a vehicle of any kind, to use one of the methods at hand for avoiding a collision, and, when he sees that is not going to have the desired effect, sit, either helpless or careless, and fail to use other means at hand. It is charged that he was driving his car at a high rate of speed; and we think the evidence would justify the jury in so finding. If he was not driving much faster

than seven miles an hour, and the hack ahead of him was also traveling at from six to seven miles an hour, it is incredible that the car could strike the hack with such force as to cause Mrs. Rosewater, in her room some distance away, to arouse her husband, Doctor Rosewater, and say to him, "There must have been somebody hurt; there was a crash in front of the house," and advise that he get up and go out. Moreover, the street could not have been very dark. It is undisputed that an arc light was burning at the street intersection a block away, and one light at Thirty-fifth street, which point they were nearing at the time of the collision. Without pursuing the matter further, we think it would be an invasion of the province of the jury to hold that a verdict should have been directed for defendant, in the face of this evidence. The trial court very properly declined to be a party to such invasion, and its action meets with our approval.

Objection is made to the rulings of the court upon objections interposed by defendant to certain questions propounded to Doctor Rosewater and Doctor Mick. These objections were not entirely without merit, as the particular questions objected to and the answers thereto were somewhat speculative, and therefore obnoxious to the rule announced in *Carlile v. Bentley*, 81 Neb. 715; but a careful examination of the testimony of all of the physicians, testifying on both sides, satisfies us that these rulings of the trial court could not have prejudiced defendant.

It is strenuously urged that the recovery is excessive. The jury returned a verdict for $4,950. Upon consideration of the motion for a new trial, the district court ruled that a new trial would be granted unless plaintiff remitted $950 from the verdict. Such a remittitur was then filed and judgment was entered for $4,000. We have carefully examined the evidence upon this branch of the case and are of the opinion that the verdict is still too large. A careful consideration of this question has impressed us with the conviction that $3,000 will fully compensate plaintiff for his injury shown by the proofs.

Upon consideration of the whole case, we think the defendant had a fair trial; that no prejudicial error is shown by the record, and that the evidence is sufficient to sustain a judgment for $3,000, but that as to the excess above that sum the judgment is excessive. The judgment of the district court is therefore reversed and the cause remanded for further proceedings, unless plaintiff within 30 days from the filing of this opinion shall file a further remittitur for $1,000, in which event the judgment of the district court will stand affirmed.

AFFIRMED.

SEDGWICK, J., dissents.

BARNES, J., dissenting.

I am unable to concur in the conclusion announced by the majority of my associates. The grounds alleged in plaintiff's petition on which a recovery was sought were, in substance, that the defendant, acting through one of its agents and employees, carelessly and negligently ran its automobile with great force and at an excessive rate of speed against a hack which the plaintiff was driving upon one of the streets of the city of Omaha, and thus caused the injuries of which he complained. Defendant's answer was a general denial, followed by a plea of contributory negligence.

To maintain his action the plaintiff testified, in substance, as follows: My name is David A. Russell. I am the plaintiff, and have resided in Omaha for over 25 years. I am going on 48 years of age. For a good many years I have been a hack-driver. On October 9, I was in the employ of Louis Boone, driving a hack on West Farnam street, in the neighborhood of Thirty-fifth street. It was a one-horse vehicle. It was the night of the Ak-Sar-Ben ball. I conveyed Mr. Black to the ball in the evening, about 8 o'clock; took him home between 12 and 1 o'clock. At the time of the accident I was going east. After leaving Mr. Black at his home, as I came east it was raining, although not a very bad night, just an ordinary rain. It

would have been dark if there were not lights on the street. It was light where the accident took place. There were lights along there. I could see a block or more ahead of me at the time. I sat on the outside of the hack, and the seat was about five feet from the ground. The seat was high up and inclined toward the front. It was called a jockey seat. In sitting, the body is out in front and you are braced. At the time of the accident I was driving about six or seven miles an hour, jogging along at a very slow rate. I was braced in my seat at the time, not expecting anything. As I was approaching Thirty-fifth street on the south side of Farnam something struck me. I was riding along, not thinking of anything, and something struck me. I felt the crash and something going. I could not tell what happened. I could not tell whether the hack fell over or what happened. I did not know anything for quite a while. When I recovered consciousness I was in Doctor Rosewater's residence across the street. (Then followed a description of plaintiff's injuries and sufferings.)

On cross-examination the plaintiff testified, in substance, as follows: I have been driving hacks for about 33 years; was raised on a farm; worked at times at landscape gardening, where I used a spade and shovel. During the last summer I drove a light wagon for the Expressmen Delivery Company; handled some trunks and small boxes; most of the time I was alone. I worked for the company not quite four months. The wagon had a high seat, and I would have to climb up there. The night of the accident I was alone. All that I know of my own knowledge is that something struck my hack. What it was I do not know, except as I learned from others. I did not see the thing that struck me either before or after the accident. On his redirect examination the plaintiff testified: The blow against my hack was a heavy one. On recross-examination he said: I did not notice the condition of my horse at the moment of the accident. I was knocked clean off, could not see anything.

The plaintiff also produced Doctor Charles Rosewater as a witness, who testified that he was a physician and surgeon; had been practicing his profession for 30 years; was a graduate of the University of Heidelberg, Germany. He said, I know the plaintiff; met him at my house at the corner of Thirty-fifth and Farnam streets on the 9th of October; when I first saw him he was on the street just being helped up by two parties. This is the way I came to go out: I had just retired; was dozing; my wife aroused me, and said, there must have been somebody hurt; there was a crash in front of the house; and I had better get up and go out. I got up, dressed quickly, went out and found Mr. Russell being assisted to his feet. My wife was in her room at the time she heard the crash.

The foregoing is the substance of all of the evidence produced by the plaintiff in any way bearing upon the accident, or the manner in which it occurred. At the close of the plaintiff's testimony the defendant requested the trial court to direct the jury to return a verdict in its favor. The motion was overruled, and an exception was noted.

As I view the record, it is quite probable that the defendant's motion should have been sustained, for it would seem that the plaintiff failed to establish any negligence on the part of the defendant which could be considered the proximate cause of the plaintiff's injury. The mere fact that there was a collision and an injury would hardly be sufficient proof of negligence to support a verdict for the plaintiff. It appears, however, that the defendant was not content to stand upon the motion, and after it was overruled introduced evidence to support the issues on its part, and to that end produced as a witness one George Hartleib, who testified, in substance, as follows:

I live in Council Bluffs; work in an automobile shop at Griswold, Iowa. In October, 1909, was employed by the Electric Garage Company; had been working for the company about three months at that time. My work was to deliver automobiles and bring them in. I would wait

at the garage until people who owned the electrics called up, and I would go to the house and bring the electric back. I operated it on the way back. I had been running an automobile for about three months prior to October 9, 1909. During the time I worked for the garage company I learned to operate automobiles. It took me three nights to learn. I knew of the T. L. Davis car. It was a Baker Electric. I had operated it about two or three months before the accident. When it was brought to the garage it was for purpose of charging it. Yes; I got word to bring the car in on October 9. I went out for it to Jackson and Thirty-seventh streets, Mr. Davis' residence. Jackson is three blocks south of Farnam. I got the car and started with it to the garage about a quarter of twelve. When I started with it there were two lights in front, burning. The car was a coupe, entirely inclosed with the top closed in and the sides. The top covered the entire framework of the car, except the wheels. I got inside of the car, closed the door and operated it from the inside; went north on Thirty-seventh street to Farnam, then east on Farnam. It was very dark and rainy. From the inside of the car and from the glass in front, covered with water, I could not see more than about 25 feet ahead of me. As I went east on Farnam street I was moving at about seven miles an hour. I had no means of knowing how fast I was going, but was able to estimate. The car was operated in this wise: There were two foot brakes and the controller; move the controller forward and the car would start; to stop the car you would throw the controller back in neutral, and apply your brakes. There were two foot brakes. There is a steering rod and handle which is different from the controller. By moving the rod forward the car moves one way, and by drawing it back the car moves the other way. The different means of operating the car were in working order on the night of the accident, and the car responded to the different means. I did not increase my speed as I went east. My machine was coasting, no power on. The

controller was on neutral. It was a very slight down grade; the means of stopping the car with the controller, as I had to, was by pushing on the brakes. I did not see the hack until I was about 25 feet from it. I could not tell what it was—just a dark object. I could tell the size of it, but could not tell whether it was moving. The hack was close to the car track on the south side. I was traveling along the south side near the car tracks, practically behind the hack. As soon as I discovered the dark object I put on the brakes and the car started skidding. The car started to turn south. I was helpless, and could do nothing. The car kept on moving; before it struck the hack it turned about one-fourth of the way around. It then struck the hack. The front end of the car struck it. I had the brakes on and was trying to stop the car. When the car struck the hack it stopped. Nothing happened to the hack; it seemed to stop. I put my reverse on and backed out to the curb, got out just in time to see the hack upset. As I stepped out of the car the hack overturned. I think it turned towards the north. When I got out I found the hack turned over, the horse down on his haunches. I saw the head and shoulders of the driver; he was between the horse and the hack. I took hold of the driver and pulled him out from under the hack, took him to the sidewalk, and put him in the care of a gentleman who happened to pass by there. I went out to unharness the horse and tie him to a telephone pole. In the meantime Doctor Rosewater came out and helped the driver to his office, with the assistance of the motorman. After the hack was picked up and the horse tied, we dragged the hack to the side of the street. After attending to the injured man in the Doctor's house, I left and drove my car back to the garage. I found a slight dent in the front hood of my car. I am not now in the employ of the garage company. I was not able to stop the car after I saw the hack in front of me. I saw no lights on the hack.

On cross-examination the witness further testified, in

substance: I am 20 years of age; was 18 at the time of the accident. I learned to operate the car in three nights. I did not look for any lights on the hack. The hack, when I first saw it, was running close to the south rail of the street-car track. There was ample room between the hack and the curb for me to pass. There was ample room on the north side of the hack to pass. Yes; I said that I could not see more than 25 feet ahead of the car through a glass covered with rain. I sat there in the car looking through the glass covered with rain, running down Farnam street. I do not know what horse-power my car was. (It is shown by the record, however, that it was $3\frac{1}{2}$ horse-power electric car.)

One George Redick testified for the defendant, in substance, as follows: I am president of the garage company. Mr. Barkalow is manager. I passed Thirty-fifth and Farnam streets soon after the accident. I was riding in an open automobile. The night was very dark, and I did not see the hack as I went by. I was acquainted with the location of the street lights. At the time of the accident there was one side-light on the southeast corner of Thirty-sixth and Farnam; that is two blocks from Doctor Rosewater's house. There was one light at Thirty-fifth and Farnam, another side-light on the south side of the street at Thirty-second. The nearest arc light to Thirty-fifth is at Thirty-fourth street. The pavement was very slippery; they had been hauling dirt on the street, and the rain on the street made the street slippery. I afterwards went to the scene of the accident.

Denise Barkalow, while on the witness stand for the defendant, describes skidding as follows: By skidding I mean that under certain conditions, due to the momentum of the car and the weight, and the fact that the rear wheels will give less resistance, the car has a tendency to slide. It might turn several times. A car will skid even when the ground is not slippery, if it is going at a very great rate of speed and you apply the brakes instantly. Applying the brakes makes the possibility of skidding

much greater. A car never skids when going at a moderate rate of speed, unless the brakes are applied.

It further appears from the testimony that the car which struck the hack was a Baker Electric. The front was glass, which could be lowered about a foot, and the glass on the side doors could be dropped down within about six inches of the level of the wood or framework. If the windows were dropped down it would leave an open space about a foot and a half; the glass in front could be dropped not quite a foot.

The foregoing is the substance of all of the evidence relating to the manner in which the accident in question occurred. At the close of all of the evidence the defendant again requested the trial court to direct the jury to return a verdict in its favor, for the reason that the plaintiff had failed to show any negligence on its part which caused the accident and the resulting injuries to the plaintiff. The motion was overruled, and an exception was taken.

The majority opinion states, in substance, that the driver of the electric car, by operating it when within its glass-inclosed top, where, owing to the darkness of the night and the rain upon the glass in front of him, he was unable to see more than 25 feet, was guilty of actionable negligence. I am not impressed with the soundness of this statement. It appears that the automobile in question was what is known as a "Baker Electric," 3½ horsepower Runabout; the kind of car ordinarily used by women and children, not capable of being run at a dangerous rate of speed, and its operation is not attended by much, if any, danger to any one. It can ordinarily be brought to a full stop within the distance of three or four feet. Cars of this kind are constructed so that they can only be operated while the driver is within the glass-inclosed top. They are in general use in cities, and are as much entitled to the use of the streets as any other vehicle commonly used as a means of travel. The driver

of such a car should not be required to open the windows of his cab, so as to admit rain or snow to drift in, and thus expose the occupants to the elements. By so doing, the very purpose of the inclosed construction of the car would be rendered useless. The driver of such a car has the right to use it in the ordinary manner, and may presume that if he can distinguish an object at the distance of 25 feet he will be able to stop and avoid an impending collision.

It further appears that the driver started to take his car to the defendant's garage at a time when travel on the streets of Omaha was over and practically abandoned for the night, and it should not be presumed that it was negligence for him to attempt to operate the car in the usual manner. He had no knowledge of the slippery condition of the pavement at the place where the accident occurred, and if we regard his testimony, which we must, for it is not disputed by any one, it is entirely clear that when he saw the plaintiff's hack, some 25 feet in advance of him, he applied the brakes, and did everything in his power to stop his car. It is equally clear that he would have succeeded in avoiding the collision if the application of the brakes and the slippery condition of the pavement had not caused the car to skid, and thus deprive him of of all control over its further movements.

It is suggested in the majority opinion that the driver of the car, at the time of the accident, must have been propelling it at an excessive rate of speed. This suggestion is based on the apparent force of the collision and the extent of the injuries to the hack. It appears, however, that where the accident occurred the street was not level, but descended in the same direction in which the vehicles were proceeding. Therefore, when the car skidded, as described by the witnesses, owing to its great weight and the loss of all control over its movements, it would naturally increase its speed until colliding with some object which would serve to stop its further progress.

This would sufficiently account for the force of the collision in a manner entirely consistent with the evidence of the driver that he was, up to the time his car commenced to skid, traveling at a moderate rate of speed.

From a careful review of the evidence, I am of opinion that the accident was one of those which could not have been avoided by the exercise of ordinary forethought and prudence, and the defendant's motion for a directed verdict should have been sustained.

Finally, it seems clear to me that the judgment of the district court is so grossly excessive as to require its reversal at our hands. It appears from the record that the defendant paid all of the expenses incurred by the plaintiff in order to recover from the injuries which he sustained; that in a short time plaintiff was able to, and did, obtain employment as the driver of an express wagon; that he followed that occupation for about 4 months, and then resumed his old occupation as a hack-driver. It was not shown that, after the time of his recovery to the day of trial, he had been compelled to lose a day's employment, or that he suffered any decrease of wages by reason of his injuries. It therefore follows that the amount of the judgment is so excessive that in justice and equity it ought not to be allowed to stand.

For the foregoing reasons, I am of opinion that the judgment of the district court should be reversed.